Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/10/2017 09:11 AM CST

In re Interest of Luz P. et al., children under
18 years of age.
State of Nebraska, appellee,
v. Lucia V., appellant.
___ N.W.2d ___

Filed February 10, 2017.    Nos. S-16-534 through S-16-538.

1. **Judgments: Jurisdiction.** A jurisdictional issue that does not involve a
   factual dispute presents a question of law.
2. **Jurisdiction: Appeal and Error.** Before reaching the legal issues
   presented for review, it is the duty of an appellate court to determine
   whether it has jurisdiction over the matter before it, even where no party
   has raised the issue.
3. ____: ____. Appellate jurisdiction of a case cannot be conferred upon a
   court by action of the parties thereto, and the absence of such jurisdic-
   tion may be asserted at any time during the pendency of the litigation.
4. ____: ____. An appellate court does not acquire jurisdiction over an
   appeal if a party fails to properly perfect it.
5. **Constitutional Law: Statutes: Jurisdiction: Time: Appeal and Error.**
   The appellate jurisdiction of a court is contingent upon timely compli-
   ance with constitutional or statutory methods of appeal.
6. **Courts: Jurisdiction.** Both juvenile courts and county courts have the
   power to vacate or modify their own judgments and orders during or
   after the term in which they were made in the same manner as provided
   for district courts.
7. **Judgments.** The purpose of an order nunc pro tunc is to correct clerical
   or formal errors in order to make the record correctly reflect the judg-
   ment actually rendered by the court.
8. ____. A nunc pro tunc order reflects now what was actually done before,
   but was not accurately recorded.
9. ____. The office of an order nunc pro tunc is to correct a record which
   has been made so that it will truly record the action had, which through
   inadvertence or mistake was not truly recorded.

10. \_\_\_\_. It is not the function of an order nunc pro tunc to change or revise a judgment or order, or to set aside a judgment actually rendered, or to render an order different from the one actually rendered, even though such order was not the order intended.

11. \_\_\_\_. An order nunc pro tunc cannot be used to enlarge the judgment as originally rendered or to change the rights fixed by it.

12. \_\_\_\_. The proper function of a nunc pro tunc order is not to correct, change, or modify some affirmative action previously taken. Rather, its purpose is to correct the record which has been made so that it will truly record the action taken, which, through inadvertence or mistake, has not been truly recorded.

13. **Judgments: Time: Appeal and Error.** An order nunc pro tunc does not change the time to appeal the order or judgment that it amends, because it only corrects clerical or formal errors. But where an order or judgment is amended in a material and substantial respect, the time for appeal runs from the date of the amendment.

14. \_\_\_\_: \_\_\_\_: \_\_\_\_. A nunc pro tunc order cannot extend the time for a party to appeal the order or judgment which the nunc pro tunc order corrects.

15. **Courts: Judgments: Legislature: Time: Appeal and Error.** Courts have the power to vacate or modify their own judgments and orders at any time during the term at which they were pronounced. But this power may not be used to circumvent the Legislature's power to fix the time limit to take an appeal.

16. **Courts: Judgments: Time: Appeal and Error.** A court may not vacate an order or judgment and reinstate it at a later date just for the purpose of extending the time for appeal.

Appeals from the County Court for Buffalo County: John P. Rademacher, Judge. Appeals dismissed.

D. Brandon Brinegar, of Ross, Schroeder & George, L.L.C., for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## NATURE OF CASE

To perfect an appeal, a party must file a notice of appeal within 30 days from the final order or judgment. Without timely filed notices of appeal, this court is without appellate jurisdiction and must dismiss these consolidated appeals.

In the case at bar, the trial court issued an order nunc pro tunc purporting to vacate its prior order, which had terminated the appellant's parental rights to her five children. The intent of the court's nunc pro tunc order was to vacate the prior order and then reinstate the order in its entirety for the express purpose of extending the appellant's time to appeal. The appellant filed notices of appeal within 30 days of the order nunc pro tunc but more than 30 days after the original order. Without evidence in the record that a party did not receive notice of the prior order, an order vacating and reinstating a prior order cannot be used to extend the time for appeal. In the absence of timely filed notices of appeal, this court is without jurisdiction. We dismiss the appeals for lack of jurisdiction.

## BACKGROUND

The appellant, Lucia V., lived in Kearney, Nebraska, with her children Luz P., Jonathan V., Esvin C., and Lindsey C., and her boyfriend, Enrique C. Enrique is the father of Esvin, Lindsey, and Eva D. (who was born after Lucia was incarcerated). Jonathan's father lives near Kearney; Luz' father is deceased.

Lucia came to the United States when Luz was 2 years old. Lucia left Luz and Luz' older brother behind in Guatemala with relatives who raised them. Luz was 14 when she moved to Nebraska from Guatemala to live with Lucia, Enrique, and her younger siblings. Jonathan, Esvin, and Lindsey were born in the United States after Lucia moved from Guatemala.

A few months after Luz arrived from Guatemala, Enrique began making sexual advances toward her. He would do this on Saturdays while Lucia was at work. In the first three

instances, Luz was able to get away from Enrique and avoid his advances. Eventually, Enrique raped her on several different occasions.

At some point in October 2014, Lucia became suspicious when she noticed how Enrique was looking at Luz. Lucia eventually convinced Luz to tell her of the sexual assaults. Lucia told Luz that she did not believe her. Later, Lucia made Luz sit down with her and Enrique and repeat the allegations. Enrique denied sexually assaulting Luz. Lucia became angry and hit Luz with a mop handle. She called Luz a liar, called her other names, and continued to hit her with the mop. According to Luz, "[Lucia] said I was a dog, a bitch, and she said that she cursed the day that I was born." Lucia also pulled Luz to the ground by her hair, which pulled out some of her hair. The next day, Lucia slapped and beat Luz with a bent wire clothes hanger.

The day after this assault, Lucia threw Luz down to the floor, forcibly pulled off Luz' pants and underwear, and sat on her. She then forcibly spread Luz' legs and put her fingers into Luz' vagina. According to Luz, Lucia was calling her a bitch and Enrique was watching and laughing. Lucia stated that she put her fingers in Luz' vagina "only to find out if indeed she had been having sexual relations with him." She stated she did this "[b]ecause that is the custom . . . in Guatemala, for what we do with girls who are out of control."

After this assault, Luz stayed at home that night. Luz said the next morning, Lucia woke her up and "threw [her] out of the house." Lucia stated that Luz left on her own after Lucia went to work that morning. Lucia did not call the police when Luz left home and did not return.

Shortly afterward, Lucia went to Luz' high school in order to "unenroll" her. The school officials had a difficult time understanding what she wanted and convinced her to come back the following week when an interpreter could be present. When Lucia came back, she spoke to Pat McLaughlin, the resource police officer. Lucia told McLaughlin that "[her] daughter had

run away, did not want to come to school, [and] was being uncooperative at home." She told McLaughlin that Luz had "tried to have sex with" her husband, Enrique. McLaughlin completed a runaway report and communicated with other officers about the search for Luz. Lucia did not disclose that she had a brother who lived in Kearney, but instead said that Luz did not have any family and that she did not know where Luz would go. Lucia did not contact the police department to check on the status of its search for Luz, nor did she provide any additional information.

McLaughlin and another officer attempted to follow up with Lucia to gain more information to aid their search for Luz. McLaughlin contacted Kearney Public Schools and learned that Luz had a sibling, Jonathan, who was enrolled in the school system. McLaughlin spoke to a school guidance counselor at Jonathan's elementary school. The counselor spoke with Jonathan and learned that he had an uncle that lived in Kearney. Lucia subsequently disclosed to the police that she had a brother in Kearney and led police to his residence.

Upon arriving at Lucia's brother's residence, the officers learned that Luz had been staying there for 2 weeks. During this time, she did not attend school. Lucia had never checked if Luz was staying there.

Luz was interviewed at a child advocacy center in Kearney. Lucia was also interviewed by a police officer. Lucia told the officer that "she believed her daughter was addicted to sex." After the interview, while she was still in the interview room, Lucia was overheard speaking on her cell phone, "'if the police talk to you, tell them that you went to Guatemala to see your mother for heart surgery.'" Lucia had previously told the police that Enrique had gone to Guatemala to see his mother. She later admitted that she had called Enrique while at the advocacy center.

After Luz and Lucia had been separately interviewed, they were allowed to sit together in the interview room. Luz told Lucia that the only thing that she told law enforcement was

that Enrique had put his arm around her. Lucia was unhappy and told Luz that she should have never said that Enrique put his arm around her but should have said that he never touched her. Lucia told Luz that she should take the blame for what happened with Enrique, saying, "'You need to take responsibility because they won't do anything to you. You're a minor. He is an adult. He will get in trouble.'" Lucia later admitted that she instructed Luz to lie and that she was trying to protect Enrique. Lucia also said that she had Jonathan trained not to talk to law enforcement.

Lucia told Luz that if she had to undergo a physical examination and was asked why she was so big "down there," that she should say that she uses a sexual "apparatus" and that Lucia got it for her.

After the police heard Lucia coaching Luz on what to say to police and talking on a cell phone with whom they believed to be Enrique, they seized her cell phone and obtained arrest and search warrants for Lucia and her home. A search of the residence disclosed a bent wire hanger and a "Swiffer [broom]" that police believed were used to beat Luz. They found hair in the trash can which was believed to have been pulled from Luz' head by Lucia. Lucia admitted that the broom was used to beat Luz.

Enrique was believed to have fled the country. Lucia testified that she last saw Enrique the day she beat Luz. Police discovered that he had bought an airplane ticket and left Kearney on October 24, 2014.

Luz, Jonathan, Esvin, and Lindsey were taken by the Department of Health and Human Services (DHHS) and placed with a foster parent who had been providing childcare for the children.

Lucia was charged with tampering with a witness, a Class IV felony; felony child abuse, a Class IIIA felony; and first degree sexual assault of a child, a Class IB felony. Lucia pled no contest to tampering with a witness and felony child abuse. The sexual assault charge was dismissed. She was

sentenced to 4 months' imprisonment on the witness tampering conviction and 1 year's imprisonment on the felony child abuse conviction. She was released in August 2015 and subsequently deported to Guatemala.

The State filed petitions seeking to adjudicate the children under Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013). In exchange for amending the petitions to state the children "lack[ed] proper parental care *through no fault* or habits of his or her parent," Lucia did not contest the petitions. The court heard testimony and determined that Luz, Jonathan, Esvin, and Lindsey lacked proper parental care under § 43-247(3)(a).

In April 2015, while Lucia was incarcerated, she gave birth to a daughter, Eva. After she was born, Eva was placed in the same foster home as her siblings. The State filed a petition alleging that Eva was under § 43-247(3)(a) as a juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent," based on Lucia's abuse and obstruction of the sexual abuse investigation, leading to her incarceration. Lucia pled no contest to this allegation.

In August 2015, the State filed motions for termination of Lucia's parental rights to all five children. The statutory basis for the termination under Neb. Rev. Stat. § 43-292 (Reissue 2016) were subsections (1), (2), and (9)—abandonment, neglect, and aggravated circumstances, respectively. The petitions also alleged that termination of Lucia's parental rights was in the best interests of the children.

In December 2015, the court held a hearing on the State's motions to terminate Lucia's parental rights. The witnesses at the hearing were two police officers who worked on the case, two DHHS children and family service specialists who worked on the case, a therapist that worked with Luz and Jonathan, the children's foster mother, Luz, and Lucia.

One of the DHHS specialists testified that termination would be in the children's best interests because of the effect of the abuse on the children. The specialist was concerned with the physical, sexual, and mental abuse as well as Lucia's blaming

Luz for the abuse by Enrique. She did not believe that Lucia had taken any accountability for her own actions. The specialist testified that the children were bonded together and were very close. She stated that Jonathan had made some further disclosures of physical abuse in therapy.

The therapist testified that he believed it was "definitely" in Luz' best interests to terminate Lucia's parental rights because of all of the trauma from Lucia's abuse and because there was not a bond between the two since Luz was raised by relatives in Guatemala, not by Lucia. As for Jonathan, the therapist was concerned about what he saw as manipulative behavior by Lucia. He said that Lucia focused a lot on herself in her letters to Jonathan. He opined that because Lucia was manipulative and Jonathan was so submissive, it would not be good for Jonathan to continue the relationship. He also testified that he believed if the younger children were to be with Lucia, her manipulative behavior would continue toward them in the future. The therapist also testified that Jonathan disclosed in therapy "how his mom was abusive with him in the past, how she would hit him, pull his ear, scream at him," and would take out her stress on him.

The children's foster mother testified that the children were very scared when they first came to her, but that they were doing much better now. She stated she would be willing to provide permanency for the children, including adoption.

Luz testified that she wanted to stay with her foster mother and did not want to go back with Lucia. She stated that if she went back to Guatemala, she would be afraid that she would see Enrique and would be afraid that "they would kill me."

Lucia testified by telephone from Guatemala. She testified that she was living with her oldest son in Guatemala and that she was seeing a counselor on a weekly basis for post-traumatic stress disorder. She had a job doing cleaning and maintenance at a school and had started a small computer business.

When asked whether she believed it would be in her children's best interests for her parental rights to remain intact and

for them to be reunited with her, Lucia said, "Yes, that's right. I am the mother, and I really need them to be here. I don't have anybody else in the world. They are my children, and I need us to be together."

The county court granted the State's motions to terminate Lucia's parental rights. The court agreed that Lucia had subjected each of the children or a sibling of the children to "aggravated circumstances" under § 43-292(9) and substantial and repeated neglect under § 43-292(2). It found that Lucia had abandoned Luz under § 43-292(1). The court concluded that termination of Lucia's parental rights was in the children's best interests and found that Lucia "is unfit based upon her abusive treatment of Luz and Jonathan and that such a personal deficiency and incapacity has prevented and will probably prevent, performance of reasonable parental obligations in child rearing in the future."

The court's consolidated order was issued on April 4, 2016. The order notes that a copy should be sent to the State's attorney, Lucia's attorney, Jonathan's father's attorney, the court-appointed special advocate, and DHHS. The certificate of service for the order indicates that the clerk sent notice of the order to the court-appointed special advocate; the Guatemalan consulate in Denver, Colorado; the guardian ad litem; and the State's attorney. The certificate of service does not indicate whether notice was sent to Lucia or her attorney.

On April 28, 2016, the court issued a consolidated order nunc pro tunc, which stated, in relevant part:

> The Court has been informed by the staff and has confirmed with the various attorneys that due to a design flaw in the "E-Filing" system of the Courts, that neither the mother's attorney nor father, Enrique, received notice of the Court's decision. Due to the failure of the attorney and father to receive notice, their right to possibly appeal the Court's decision has been severely compromised in that the time for the same has almost expired as they are now just finding out about the Court's decision.

Therefore, in an effort to correct that problem, the
Court hereby vacates its previous Order filed on April 4th,
2016, and now reissues that Order in all respects under
today's date, so that those parties will have an appropriate
amount of time to contemplate and perhaps file an appeal
of the Court's decision.

It does not appear from our record that any party moved to
vacate the April 4 order. It also does not appear that any evi-
dence was admitted, by affidavit, testimony, or otherwise, to
show that Lucia and her attorney did not receive notice of the
court's April 4 order. On May 23, Lucia filed notices of appeal
from the court's April 28 order nunc pro tunc.

The Nebraska Court of Appeals directed the parties "to
include in their briefing the potential jurisdictional problem
caused by the juvenile court's vacating its prior order nunc
pro tunc and reissuing the same order for the purpose of
extending a party's time to appeal." Thereafter, we moved
the cases to our docket on our own motion pursuant to our
statutory authority to regulate the caseloads of the appellate
courts of this state pursuant to Neb. Rev. Stat. § 24-1106(3)
(Reissue 2016).

## ASSIGNMENT OF ERROR

Lucia's sole assignment of error is that the county court
erred in finding by clear and convincing evidence that it was
in her children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

[1] A jurisdictional issue that does not involve a factual dis-
pute presents a question of law.[1]

## ANALYSIS

[2,3] Before reaching the legal issues presented for review,
it is the duty of an appellate court to determine whether it has
jurisdiction over the matter before it, even where no party has

---

[1] *In re Interest of LeVanta S., ante* p. 151, 887 N.W.2d 502 (2016).

raised the issue.[2] Appellate jurisdiction of a case cannot be conferred upon a court by action of the parties thereto, and the absence of such jurisdiction may be asserted at any time during the pendency of the litigation.[3]

[4,5] An appellate court does not acquire jurisdiction over an appeal if a party fails to properly perfect it.[4] The appellate jurisdiction of a court is contingent upon timely compliance with constitutional or statutory methods of appeal.[5]

To perfect an appeal, Neb. Rev. Stat. § 25-1912(1) (Reissue 2016) requires that a notice of appeal be filed "within thirty days after the entry of such judgment, decree, or final order" appealed from. We have held that the timely filing of a notice of appeal is a jurisdictional requirement.[6]

The order terminating Lucia's parental rights was entered on April 4, 2016. On April 28, the court entered an order nunc pro tunc purporting to vacate the April 4 order and to reinstate it in all respects as of that date in order to preserve Lucia's opportunity to appeal the order. Lucia filed her notices of appeal on May 23. Lucia's notices of appeal were therefore filed within 30 days of the April 28 order nunc pro tunc and not within 30 days of the April 4 order terminating her parental rights.

Whether we have jurisdiction in this case depends on whether Lucia satisfied the requirement of § 25-1912(1) that her notices of appeal be filed within 30 days. This, in turn, depends on whether the April 28, 2016, order nunc pro tunc was a valid order by the court which extended the time for Lucia to appeal.

---

[2] See, *In re Interest of L.T., ante* p. 105, 886 N.W.2d 525 (2016); *Schlake v. Schlake*, 294 Neb. 755, 885 N.W.2d 15 (2016).

[3] *Harms v. County Board of Supervisors*, 173 Neb. 687, 114 N.W.2d 713 (1962).

[4] *In re Interest of L.T., supra* note 2.

[5] *Id.*

[6] *Id.*

[6] Both juvenile courts and county courts have the power to vacate or modify their own judgments and orders during or after the term in which they were made in the same manner as provided for district courts.[7] District courts have the power to vacate and modify their judgments and orders under Neb. Rev. Stat. § 25-2001 (Reissue 2016). Section 25-2001(3) allows courts to issue nunc pro tunc orders:

> Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court by an order nunc pro tunc at any time on the court's initiative or on the motion of any party and after such notice, if any, as the court orders.

[7,8] The purpose of an order nunc pro tunc is to correct clerical or formal errors in order to make the record correctly reflect the judgment actually rendered by the court.[8] The term "'[n]unc pro tunc'" is a Latin phrase that means "'now for then.'"[9] A nunc pro tunc order reflects now what was actually done before, but was not accurately recorded.[10] The power to issue nunc pro tunc orders is not only conveyed by statute, but is inherent in the power of the courts.[11]

[9-12] An order nunc pro tunc differs from an order substantively amending or vacating a court's prior order.[12] In *Continental Oil Co. v. Harris*,[13] we explained:

---

[7] See Neb. Rev. Stat. §§ 25-2720.01 and 43-2,106.02 (Reissue 2016). See, also, Neb. Rev. Stat. § 43-245(12) (Reissue 2016).

[8] See, *State v. Sims*, 277 Neb. 192, 761 N.W.2d 527 (2009); *Calloway v. Doty*, 108 Neb. 319, 188 N.W. 104 (1922); *Van Etten v. Test*, 49 Neb. 725, 68 N.W. 1023 (1896).

[9] 46 Am. Jur. 2d *Judgments* § 130 at 487 (2006). See, also, 49 C.J.S. *Judgments* § 155 (2009).

[10] See *id.*

[11] *Van Etten v. Test, supra* note 8.

[12] See *Continental Oil Co. v. Harris*, 214 Neb. 422, 333 N.W.2d 921 (1983).

[13] *Id.* at 424, 333 N.W.2d at 923.

[T]he office of an order nunc pro tunc is to correct a record which has been made so that it will truly record the action had, which through inadvertence or mistake was not truly recorded. It is not the function of an order nunc pro tunc to change or revise a judgment or order, or to set aside a judgment actually rendered, or to render an order different from the one actually rendered, even though such order was not the order intended. An order nunc pro tunc cannot be used to enlarge the judgment as originally rendered or to change the rights fixed by it. Neither can it be employed where the fault in the original judgment is that it is wrong as a matter of law, nor can it be employed to allow the court to review and reverse its action with respect to what it formerly did or refused to do.

In *Ferry v. Ferry*,[14] we said:

The proper function of a nunc pro tunc order is not to correct, change, or modify some affirmative action previously taken. Rather, its purpose is to correct the record which has been made so that it will truly record the action taken, which, through inadvertence or mistake, has not been truly recorded.

[13,14] An order nunc pro tunc does not change the time to appeal the order or judgment that it amends, because it only corrects clerical or formal errors.[15] But where an order or judgment is amended in a material and substantial respect, the time for appeal runs from the date of the amendment.[16] Because an order nunc pro tunc merely makes the record reflect what the court actually decided in the original order or judgment and does not make any substantive or material change to the order or judgment, the order relates back to the

---

[14] *Ferry v. Ferry*, 201 Neb. 595, 600-01, 271 N.W.2d 450, 454 (1978).

[15] See *Interstate Printing Co. v. Department of Revenue*, 236 Neb. 110, 459 N.W.2d 519 (1990).

[16] See *id.*

date of the original order or judgment.[17] Thus, a nunc pro tunc order cannot extend the time for a party to appeal the order or judgment which the nunc pro tunc order corrects.[18]

The court's April 28, 2016, order did not extend Lucia's time to appeal the termination of her parental rights, because a nunc pro tunc order exists for the purpose of correcting clerical errors in the court records and its effect relates back to the time of the original order.

While the court's April 28, 2016, order is labeled "Order Nunc Pro Tunc," it also expressly states that it vacates the original order and reinstates it in whole as of that date. The stated intent of this was to extend the time to appeal, a substantive change in the rights of a party. By definition, this is something that an order nunc pro tunc cannot do. The order's stated intent makes clear that the label "Order Nunc Pro Tunc" is a misnomer. Rather, the order is one substantively amending, by vacating and reinstating, the earlier order.

[15,16] Courts have the power to vacate or modify their own judgments and orders at any time during the term at which they were pronounced.[19] But this power may not be used to circumvent the Legislature's power to fix the time limit to take an appeal.[20] A court may not vacate an order or judgment and reinstate it at a later date just for the purpose of extending the time for appeal.[21] Where a later order or judgment modifies, vacates, amends, or contradicts a prior order or judgment, the time for appeal from that portion of the later order which

---

[17] See *id.*

[18] See *id.*

[19] *Moackler v. Finley*, 207 Neb. 353, 299 N.W.2d 166 (1980). See, also, § 25-2001(1).

[20] *Morrill County v. Bliss*, 125 Neb. 97, 249 N.W. 98 (1933). See, also, *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013); *In re Interest of Noelle F. & Sarah F.*, 249 Neb. 628, 544 N.W.2d 509 (1996); *Ricketts v. Continental Nat. Bank*, 169 Neb. 809, 101 N.W.2d 153 (1960).

[21] *Morrill County v. Bliss, supra* note 20.

contradicts the earlier order—*and that portion only*—runs from the issuance of the later order.[22]

One exception to this rule against using a court's power to vacate as a tool to extend the time for appeal is where a clerk fails to provide notice of a judgment to a party, thereby impairing the party's ability to appeal.[23] As we said in *Nye v. Fire Group Partnership*,[24] "the right of a party to move for a new trial or to appeal cannot ordinarily be defeated by the clerk of the court's failure to give the parties notice of the entry of the judgment." As the Court of Appeals has noted, "the proper method of addressing the situation would have been by a motion to vacate" the original order.[25]

But a motion to vacate an order or judgment on the basis that the clerk failed to provide a party with notice, thereby impairing the party's ability to appeal, must be supported by some evidence. Here, the court based its decision because it "ha[d] been informed by the staff and ha[d] confirmed with the various attorneys that due to a design flaw in the 'E-Filing' system of the Courts, . . . the mother's attorney [did not] receive[] notice of the Court's decision." The problem is there was no record made by any of the parties that would support the court's finding. The court's statement is not evidence. There is simply no evidence in the record from the court staff, the attorneys, or anyone else to establish that Lucia and her attorney did not receive notice of the court's order. No affidavits were submitted to this effect, nor was there any testimony offered. The court is not permitted to make this determination without some type of evidence to support the finding by the court.

---

[22] See *Manske v. Manske*, 246 Neb. 314, 518 N.W.2d 144 (1994).

[23] See *Nye v. Fire Group Partnership*, 263 Neb. 735, 642 N.W.2d 149 (2002).

[24] *Id.* at 740, 642 N.W.2d at 153.

[25] *TierOne Bank v. Cup-O-Coa, Inc.*, 15 Neb. App. 648, 652, 734 N.W.2d 763, 767 (2007).

While the certificate of service for the April 4, 2016, order states that other parties were served with a copy of the order, it does not state whether Lucia and her attorney were provided notice. Nor is there any direct evidence in the record that they were not provided notice of the order. Absent a record, we cannot assume that the clerk failed to notify an attorney of record of the court's order. Moreover, it does appear that Lucia's attorney was notified of the April 4 order at some point prior to the April 28 order and within the 30-day window to file notices of appeal.

Because there is no evidence in the record to establish that Lucia and her attorney did not receive notice of the court's order, the court's April 28, 2016, order purporting to vacate and reinstate the April 4 order for the purpose of extending Lucia's time to appeal was invalid and, as such, could not extend the time to appeal established by the Legislature. To timely perfect her appeals, Lucia was required to file notices of appeal within 30 days of the April 4 order. Absent a record that she did not timely receive notice of the April 4 order, the district court had no authority to issue its April 28 order, which attempted to extend Lucia's time to appeal.

## CONCLUSION

Because Lucia failed to file notices of appeal within 30 days of the April 4, 2016, order terminating her parental rights and because there is no evidence in the record to show that she and her attorney did not receive notice of the order before the time to appeal had expired, this court is without jurisdiction and must dismiss these appeals.

APPEALS DISMISSED.